UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIM. ACTION NO. 3:25-CR-0310-B-1 |
| | § | |
| JEFFREY LANCE DEAVER, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Jeffrey Lance Deaver's Motion to Suppress (Doc. 37). Deaver moves the Court to suppress certain physical evidence and statements made during and following an extended traffic stop. *See* Doc. 37, Mot. Suppress, 1. On March 31, 2026, the Court held an evidentiary hearing on the Motion. After consideration of the parties' briefs and evidence presented at the hearing, the Court **DENIES** Deaver's Motion.

**I.**

**BACKGROUND**

Deaver is charged with one count of possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii). *See* Doc. 5, Indictment, 1. Trial is set for April 20, 2026. *See* Doc. 36, Order.

In August 2024, the Drug Enforcement Administration ("DEA") began investigating Deaver in connection with a larger interstate drug trafficking investigation. Specifically, DEA agents believed that Deaver was receiving money from individuals in Dallas and Oklahoma and using those funds to purchase methamphetamine in Houston. Doc. 37, Mot. Suppress ¶¶ 1-2; Doc. 43, Resp. ¶¶ 1-2.

In October 2024, DEA agents obtained a vehicle-tracker search warrant for Deaver's vehicle—

a maroon Jeep Grand Cherokee. The tracking data showed Deaver traveling to Houston twice in November 2024 and twice in December 2024. Doc. 37, Mot. Suppress ¶¶ 3-4; Doc. 43, Resp. ¶ 3. Three days after returning from one such trip, DEA agents witnessed Deaver exchange a large duffel bag for a small backpack from a known associate of one of the investigation's targets. Doc. 37, Mot. Suppress ¶ 5.

On January 22, 2025, the DEA, through the vehicle tracking data, observed Deaver making a fifth trip to Houston. *Id.* ¶ 6; Doc. 43, Resp. ¶ 4. Deaver arrived in Houston around 9 p.m. Shortly thereafter, Houston DEA agents observed Deaver meet someone in a McDonald's parking lot and receive a "weighted package." Doc. 37, Mot. Suppress ¶ 7; Doc. 43, Resp. ¶ 5. Deaver then began traveling back toward Dallas.

For local assistance, DEA special agent Pablo Orejuela had contacted the DEA Houston Division and the Texas Department of Public Safety ("TDPS"). Agent Orejuela briefed DEA Houston agents and TDPS troopers, including State Trooper Michael Turner, on the investigation. Specifically, Agent Orejuela informed Trooper Turner that Deaver was suspected of methamphetamine trafficking, that Deaver had made several prior trips to Houston, that Deaver drove a Maroon Jeep Grand Cherokee, that the DEA had a tracker warrant on Deaver's vehicle, that Deaver had arrived in Houston around 9 p.m. that evening, and that shortly after arrival Deaver was observed exchanging a weighted package with an unidentified individual. Agent Orejuela requested that Trooper Turner, who was then patrolling the interstate, intercept Deaver's vehicle and conduct a traffic stop.

On January 23, 2025, at 1:27 a.m., Trooper Turner, who had been waiting along the shoulder of the interstate, observed Deaver commit a traffic violation for traveling in the left lane

without passing (Tex. Transp. Code §§ 544.011, -004) and initiated a traffic stop. Trooper Turner informed Deaver of the reason for the stop (a traffic violation), told Deaver he would receive a warning, and asked for Deaver's driver's license and insurance. Due to noise levels on the highway, cold weather, and safety concerns, Trooper Turner then asked Deaver to step out of his vehicle and sit in the patrol car while Trooper Turner ran a license and warrant check on his computer. *See* Doc. 37, Mot. Suppress ¶¶ 8-10; Doc. 43, Resp. ¶¶ 7-9.

While running those searches, Trooper Turner engaged Deaver in conversation and asked him some questions. When asked when he had arrived in Houston, Deaver, after initially stating that he arrived that evening, quickly corrected himself and stated he had arrived "earlier today." Doc. 47, Hr'g Ex. 2, at 00:10-00:16. Then, several minutes later, Deaver stated he arrived in Houston "around noon." *Id.* at 03:50-04:08. When asked about the purpose for his visit, Deaver stated that he was returning from a hospital visit to a terminally ill relative. *Id.* at 00:20-00:42.[1] Because Deaver's response directly conflicted with the DEA's information, Trooper Turner suspected it was a fabrication.

About 11 minutes after bringing Deaver into the patrol car, and 14 minutes after initiating the traffic stop, Trooper Turner completed the license and warrant search.

Trooper Turner then quickly asked Deaver several questions about the contents of his car. Deaver denied having any explosives or weapons, quickly responding in the negative each time. *See id.* at 11:27-11:32. Deaver also denied having any "large sums" of money, first responding with an

---

[1] Trooper Turner also testified that Deaver's demeanor during the initial 14 minutes of the stop was suspicious because Deaver appeared nervous. To the extent video evidence conflicts with this assertion, the Court gives little weight to Trooper Turner's conclusory statements about demeanor. *See United States v. Monsivais*, 848 F.3d 353, 359 (5th Cir. 2017) ("[W]e often give little or no weight to an officer's conclusional statement that a suspect appeared nervous." (citation omitted)). Nevertheless, the Court takes Trooper Turner's observations about Deaver's demeanor into account where it is not in conflict with video evidence.

"um" and a pause, then saying "no" and mentioning $2,000 of cash he had in his wallet. *See id.* at 11:32-11:49. When asked if he had any drugs in the vehicle such as marijuana, fentanyl, or cocaine, Deaver quickly responded in the negative each time. *See id.* at 11:49-12:10. Trooper Turner then asked whether Deaver had methamphetamine, and Deaver calmly responded "no." *See id.* at 12:10-12:18. But unlike prior answers—where Deaver responded quickly and sometimes rambled after providing his initial response—Deaver then remained silent. *See id.* Trooper Turner noted a difference in how Deaver answered questions about other drugs from Deaver's response regarding methamphetamine.

Based on his belief that Deaver was involved in criminal activity, Trooper Turner asked for Deaver's consent to search his vehicle. When Deaver declined, Trooper Turner requested K-9 assistance to conduct a free air sniff of the exterior of the vehicle. When Trooper Turner informed Deaver of the dog sniff, Deaver nodded and remained silent. *See id.* at 13:22-13:50. Trooper Turner noted an "extreme change" in Deaver's demeanor at this point: Deaver "clammed up" and looked as though "the life was just pulled" out of him. The K-9 arrived thirty minutes later and gave a positive alert for the presence of narcotics. The following vehicle search uncovered $74,000 in U.S. currency and 19 bundles of suspected methamphetamine on the floorboard between the front passenger and rear seat.

By the present Motion, Deaver does not challenge the propriety of the initial traffic stop. Instead, Deaver contends that Trooper Turner's extension of the traffic stop for a dog sniff violated his Fourth Amendment right against unreasonable searches and seizures because Trooper Turner lacked a reasonable suspicion for extending the stop. *See* Doc. 37, Mot. Suppress, 4-5. Deaver asks the Court to suppress all physical evidence and any oral or written statements obtained from him as

a result of the extended stop. *Id.* at 1, 5.

## II.

## LEGAL STANDARD

"The proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Garcia*, 99 F.4th 253, 267 (5th Cir. 2024). Where there are undisputed facts that a seizure was made without any warrant, the government bears the burden of proving that the seizure was nevertheless justified. *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (citation omitted).

The legality of a traffic stop—a warrantless seizure under the Fourth Amendment—involves a two-pronged analysis first described in *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Emerson*, No. 23-50905, 2024 WL 4579245, at *1 (5th Cir. Oct. 25, 2024) (citing *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc)). To evaluate whether a Fourth Amendment violation occurred during the stop, the Court assesses (1) whether the officer's initial stop was justified and (2) whether the officer's subsequent actions "were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *See Brigham*, 382 F.3d at 506-07 (citation omitted). "This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Id.* at 507 (citations omitted). Deaver challenges only the second prong.

The "reasonableness" of the officer's subsequent actions in prolonging the initial stop is a "fact-specific" inquiry into "the totality of the circumstances." *Id.* (citing *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). "Reasonable suspicion requires more than an inchoate and unparticularized

suspicion or hunch." *Pigott v. Gintz*, No. 23-30879, 2024 WL 5087911, at *9 (5th Cir. Dec. 12, 2024) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000)) (quotation marks omitted). An officer's suspicion must be supported by "articulable facts" that a crime has been or is being committed. *Id.* (citation omitted). In conducting this inquiry, Courts must allow law enforcement officers "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Brigham*, 382 F.3d at 507 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

## III.

## ANALYSIS

The Court must decide if Trooper Turner violated Deaver's Fourth Amendment rights when Trooper Turner prolonged the traffic stop long enough to ask additional questions and obtain a dog sniff. While the dog sniff was not reasonably related to the initial traffic stop, Trooper Turner had an independent and reasonable suspicion of criminal activity based on both his observations during the stop and his prior knowledge of the DEA's investigation. Accordingly, the Court **DENIES** Deaver's Motion.

A.    *Trooper Turner Was Free to Ask Questions While Conducting the Initial Lawful Traffic Stop.*

As an initial matter, Trooper Turner's questions during the initial traffic stop did not violate Deaver's Fourth Amendment rights because they did not themselves extend the length of the stop. During a traffic stop, an officer's actions must normally be "reasonably related in scope to the circumstances that justified the stop." *Id.* at 506 (citation omitted). In conjunction with an ordinary traffic stop, an officer is free to ask questions if the questioning does not lengthen the roadside detention—even if the questions are unrelated to the circumstances causing the stop. *Rodriguez v.*

*United States*, 575 U.S. 348, 354 (2015); *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010) (citation omitted), *modified in part*, 622 F.3d 383 (5th Cir. 2010). An ordinary traffic stop typically entails inquiries like "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355.

Here, Trooper Turner asked Deaver various questions unrelated to the traffic violation itself. This included questions about Deaver's trip and his terminally ill relative, among other things. But Trooper Turner asked all of those questions within the initial 14 minutes of the stop while he ran the license and warrant checks and filled out the warning form. Because those questions did not extend the length of the initial traffic stop, they did not violate the Fourteenth Amendment. And even if Trooper Turner's initial questions did extend or otherwise exceed the scope of the initial traffic stop, Trooper Turner was entitled to ask additional questions based on a reasonable suspicion of a drug crime, as discussed more fully below. *See United States v. Powell*, 732 F.3d 361, 371 (5th Cir. 2013).

B.      *Trooper Turner Had a Reasonable Suspicion That Justified Extending the Stop to Obtain a Dog Sniff.*

Trooper Turner had a reasonable suspicion to extend the traffic stop because he knew that Deaver was being deceptive during the initial traffic stop and that only a few hours earlier, Deaver had received a weighted package in a McDonald's parking lot at night. Unlike running a license or warrant check, where an officer wishes to prolong a traffic stop for additional questioning or a dog sniff, that conduct is "aimed at detecting evidence of ordinary criminal wrongdoing" and thus "is not an ordinary incident of a traffic stop." *Id.* at 356 (citation modified). The lawfulness of the extended stop in such cases depends on "whether reasonable suspicion of criminal activity justified

detaining [the suspect] beyond completion of the traffic infraction investigation." *Id.* at 358; *see Brigham*, 382 F.3d at 507 (holding that officers can extend traffic stops for reasons unrelated "to the circumstances that justified the stop" to investigate and "dispel[] . . . reasonable suspicion developed during the stop").

In conducting this inquiry, the Court must consider both articulable facts specifically in Trooper Turner's possession when he extended that stop, as well as any articulable facts that may be imputed to his decision to extend the stop under the collective knowledge doctrine. Under that doctrine, "an officer initiating the stop or conducting the search need not have personal knowledge of the evidence that gave rise to the reasonable suspicion or probable cause, so long as he is acting at the request of those who have the necessary information." *United States v. Zuniga*, 860 F.3d 276, 283 (5th Cir. 2017) (citation omitted). All that is required for its application is that there be "some degree of communication" between the acting officer and those with "knowledge of the necessary facts." *Id.* In the context of a traffic stop, where multiple officers receive information, but "neither [officer's] information [is] independently sufficient to constitute reasonable suspicion, but [the two officers] are in communication" the "combination of [the two officers] information" can collectively justify a stop. *United States v. Wright*, 74 F.4th 722, 731 (5th Cir. 2023).

Information obtained by an officer prior to a traffic stop, coupled with an additional observation of the detainee's untruthfulness or nervousness during the stop, can together support a reasonable suspicion necessary to prolong a stop for additional investigation—including to conduct a free-air dog sniff. *See United States v. Andres*, 703 F.3d 828, 833-34 (5th Cir. 2013) (finding the officer had reasonable suspicion that justified additional questioning and a dog sniff because the defendant's story conflicted with information that the detaining officer obtained from other officers

and because the detaining officer knew of an anonymous tip that the defendant was carrying drugs); *United States v. Thompson*, 783 F. App'x 360, 365 (5th Cir. 2019) (finding the officer had a reasonable suspicion that justified conducting a dog sniff where the officers had received an anonymous tip about the defendant's suspected drug trafficking activity prior to the stop and the detainee acted nervous during the traffic stop); *United States v. Berry*, 664 F. App'x 413, 419-20 (5th Cir. 2016), *as revised* (Dec. 14, 2016) (finding the officer had a reasonable suspicion that justified conducting a dog sniff "particularly" because the DEA had briefed the detaining officer on the defendant's suspected drug trafficking activity and the defendant's story conflicted with that brief); *United States v. Henton*, 600 F. App'x 263, 264 (5th Cir. 2015) (citations omitted) (holding that the officer had a "reasonable suspicion to prolong the traffic stop and conduct the dog sniff" because the officer received information from a confidential informant prior to the stop that the defendant was selling heroin and because the defendant was nervous and gave conflicting statements during the stop). *But see United States v. Spears*, 636 F. App'x 893, 899, 902 (5th Cir. 2016) (finding officer did not have reasonable suspicion to extend a traffic stop where the officer believed, but did not know or have evidence to reasonably suggest, that the defendant was being untruthful during the stop, and the defendant "had not previously been identified as a suspect connected with drug activity").

In *Andres*, police had observed the defendant, the subject of a DEA investigation for suspected drug trafficking, driving his vehicle near Joliet, Illinois. 703 F.3d at 833. Shortly thereafter, another officer, who had been informed of the defendant's location, pulled the defendant over for a traffic violation. *See id.* Before he had concluded the traffic stop, the detaining officer asked the defendant where he was coming from. *See id.* But the defendant's answer directly conflicted with what the detaining officer already knew based on what the other officers had observed. *See id.* Based

on the defendant's apparent dishonesty, the officer asked additional questions, including about the identity of a passenger in the defendant's vehicle and whether the defendant had drugs in the vehicle, which the defendant denied. *See id.* at 831. These questions generated even further suspicion, and the officer then conducted a consented-to dog-sniff search of the vehicle, which alerted to the presence of drugs. *See id.* The Fifth Circuit held that the defendant's dishonesty "created further suspicion justifying continued detention" and that this, coupled with the defendant's subsequent answers, generated sufficient "additional reasonable suspicion" to justify the search. *Id.* at 834.

Similar to the above cases, the Fifth Circuit has held that if an officer has reasonable suspicion of a drug crime based on information obtained prior to the traffic stop, it can *independently* provide a "basis for prolonging the investigatory detention beyond the parameters of a run-of-the-mill traffic stop." *Powell*, 732 F.3d at 371; *see United States v. Johnson*, 655 F. App'x 247, 249 (5th Cir. 2016) (holding that "reliance by an officer on information of drug activity developed before a traffic stop can be used as an additional justification for the traffic stop," as well as for subsequent delays for a dog sniff). In *Powell*, a known informant told law enforcement officers that the defendant had just purchased cocaine at his home and intended to sell it elsewhere. 732 F.3d at 366. Those officers contacted another officer, who followed the defendant and initiated a traffic stop when he observed a traffic violation. *See id.* at 367. After concluding the initial traffic stop, the officer called for a drug-sniffing dog which alerted to the presence of drugs. *See id.* The Fifth Circuit found that due to the informant's tip, the officer had a "reasonable suspicion of drug crime" that "justified the time taken to process the initial traffic infraction, the scope of [the officer's] questioning, and the delay in waiting for the canine unit." *Id.* at 371.

Trooper Turner had a reasonable suspicion of criminal activity that justified detaining Deaver after completing the initial traffic stop. Before the traffic stop, Trooper Turner knew that Deaver had arrived in Houston around 9 p.m. and was seen obtaining a weighted package from an unknown individual before leaving Houston that same night. Trooper Turner was also aware that the DEA suspected Deaver of drug trafficking because they had observed Deaver making similar trips in recent months. After Deaver's most recent trip, the DEA observed Deaver exchanging a duffel bag for a backpack with a known associate of one of the DEA investigation's other targets.[2] During the traffic stop, Deaver lied to Trooper Turner about the timing of his trip within the first four minutes. Trooper Turner also observed a change in Deaver's demeanor when answering a question about methamphetamine and when informed of the dog sniff.

In sum, Trooper Turner's suspicion that Deaver was engaged in additional criminal activity can be grounded in the following articulable facts: (1) Deaver was being untruthful during the traffic stop about the timing of his trip and may have been untruthful about its nature, (2) Deaver's response to Trooper Turner's question about methamphetamine was different from Deaver's prior answers, (3) Deaver had only hours earlier been seen obtaining the package, (4) Deaver had made four similar trips in recent months, (5) after his previous trip Deaver was seen exchanging a duffel bag for a backpack from a known associate of another target in the same DEA investigation, and (6) Deaver appeared distressed when informed that Trooper Turner would call in a K-9 for the free-air dog sniff. Considering the totality of the circumstances, the above articulable facts provided Trooper Turner with reasonable suspicion of criminal activity and justified his subsequent actions in obtaining a free-air dog sniff to dispel that suspicion. *See Brigham*, 382 F.3d at 507.

---

[2] While the Court is unaware of whether Agent Orejuela specifically informed Deaver of this point, it can be imputed to him under the collective knowledge doctrine. *See Wright*, 74 F.4th at 731.

Trooper Turner did not violate Deaver's Fourth Amendment rights against unreasonable searches and seizures because he had a reasonable suspicion of criminal activity based on specific articulable facts that justified extending the search to dispel that suspicion.

**IV.**

**CONCLUSION**

For the reasons stated above, the Court **DENIES** Deaver's Motion to Suppress (Doc. 37).

**SO ORDERED**.

**SIGNED: April 2, 2026.**

_____
JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE